SYNCRO CORPORATION, Petitioner,
Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross-Petitioner.

No. 78–1580.

United States Court of Appeals,
Fifth Circuit.

June 25, 1979.

Gardner, Ambrister & Smith, George V. Gardner, Washington, D. C., Asa Ambrister, Nashville, Tenn., for petitioner, cross-respondent.

Elliott Moore, Deputy Associate, Gen. Counsel, Morton Namrow, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., for respondent, cross-petitioner.

Donald E. Howard, Resident Officer, Birmingham, Ala., for other interested party.

Before GEWIN, GEE and RUBIN, Circuit Judges.

GEE, Circuit Judge:

Syncro Corporation (the Company) petitions to review and set aside an order of the National Labor Relations Board, which found that the Company violated sections 8(a)(3)[1] and (1)[2] of the National Labor Relations Act by its discharge of employee Michelle Hill. The Board seeks enforcement of the same order. We deny enforcement.

1. 29 U.S.C. § 158(a)(3) provides:
    (a) It shall be an unfair labor practice for an employer—
      *   *   *   *   *   *
      (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization  .   .  ..
2. 29 U.S.C. § 158(a)(1) provides:
    (a) It shall be an unfair labor practice for an employer—
      (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

The Company operates a plant in Arab, Alabama, which manufactures vehicular brake components and small engine electric parts. In February 1977, the Union[3] began an organizing campaign among the Company's employees. Michelle Hill, a Company employee for approximately 20 months, began working with the Union in its organizational drive. She was the first employee to do so and thereafter remained the leading union activist in the plant. Hill compiled lists of prospective union members, attended union meetings, obtained union card signatures from employees, and passed out handbills outside the plant entrance.

Meanwhile, the Company's executive vice president and general manager, Blair Stentz, had been made aware of the organizational campaign. He reacted by summoning the employees into the plant cafeteria on February 21 and 22, where he delivered anti-union speeches.[4] At about this same time, Stentz and Hill began to have personal difficulties. Stentz accused Hill of misjudging him and questioning his honesty; this disagreement arose when she asked Stentz to produce a financial statement during a group meeting between plant employees and outside consultants. He asked her on several occasions to come to his office so that they could talk out their differences, but Hill never did so. Finally, Stentz confronted Hill while she was compiling a list of employee names from timecards for use in contacting them concerning the Union. He told her that he had received complaints about her taking names and instructed her not to do it any more.

3. International Molders & Allied Workers Union, AFL–CIO–CLC.

4. These speeches were the basis of a finding by the ALJ and the Board that the Company violated section 8(a)(1) of the Act by threatening to close the plant if the employees selected the union, by soliciting opposition to the union and aid for the Company's anti-union campaign, and by creating an impression that the employees' union activities were under surveillance. The Company does not challenge these findings in this court.

Hill was discharged by the Company on April 5, 1977. Stentz testified that he made the decision based on the complaints of employees Marilyn Walker and Patsy Hayes, who related separate threats made against them by Hill. Each gave statements to the Company and later testified that, on the Friday before her termination, Hill had asked them to sign a union card. When they refused she threatened to slash their tires. A male employee also told Stentz of the threats the following Monday but requested anonymity because of his fear of reprisals. Hill admitted making the statements and also admitted pushing Walker into a bathroom stall in an effort to get her to sign a union card; she maintained, however, that she was only "cutting up" with the two women and that she made no threats against any fellow employee. Her explanation was that joking "threats" of tire slashing were common in the plant after Stentz made his anti-union speeches.[5] Another employee, Sara Garrett, also testified to this effect, but both Walker and Hayes expressed their fear of the threats and testified that they believed them to be genuine.

The ALJ found that the Company did not violate sections 8(a)(3) and (1) of the Act in discharging Michelle Hill. He expressly discredited the testimony that plant employees joked about tire slashing and also discredited Hill's denials. Thus, he determined that she had made the threats against Walker and Hayes and that, although the Company clearly knew of Hill's union sympathies and activities, she was discharged for just cause. The Board, however, disagreed and was "unable to conclude that Hill was discharged for threatening employees rather than for her union activities." The Board emphasized that Stentz had exhibited

hostile feelings toward Hill and found that the stated reason for the discharge was merely a pretext.[6] Relying on its conclusion that Walker and Hayes did not take the threats seriously, which the Board considered to be consistent with the atmosphere in the plant where tire-slashing jokes were common, and on the lack of an extensive investigation of the charges, the Board found that Hill's discharge was motivated by her union activities, in violation of section 8(a)(3) and (1) of the Act. The Company was ordered to reinstate Michelle Hill with back pay. On appeal the Company argues that this decision is not supported by substantial evidence.

We begin by reciting the familiar principle that, absent a showing of anti-union motivation, an employer may discharge an employee for good cause, or bad cause, or no cause at all. E. g., Federal Mogul Corp. v. N. L. R. B., 566 F.2d 1245 (5th Cir. 1978); Mueller Brass Co. v. N. L. R. B., 544 F.2d 815 (5th Cir. 1977). In discharge cases, the motivation of the employer is the controlling factor. Mueller Brass Co. v. N. L. R. B., supra, and the burden is on the Board to prove that anti-union animus was the motivating cause for the discharge. N. L. R. B. v. Florida Steel Corp., 586 F.2d 436 (5th Cir. 1978).[7] Moreover, improper motivation is not to be inferred lightly. N. L. R. B. v. McGahey, 233 F.2d 406 (5th Cir. 1956).

On appeal of a Board order, we must enforce its findings if the record, taken as a whole, shows substantial evidence to support those findings. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Where, as here, the Board does not accept the findings of the ALJ, the court of appeals must examine the evidence and findings of the Board

---

5. Hill testified that Stentz told his employees, inter alia, that a union victory meant people getting shot and tires being slashed. The ALJ expressly discredited this testimony and credited Stentz' version of his speeches, which included no such inflammatory references. The Board impliedly credited Hill's version.

6. The Board apparently also credited Hill's explanation that she was only joking.

7. Where good cause for the discharge is shown, the mere fact that anti-union animus existed on the part of the employer does not, without more, make the discharge unlawful. The Board must provide a causal connection between the anti-union feelings of the employer and the discharge. N. L. R. B. v. Florida Steel Corp., 586 F.2d at 448.

more critically than it would if the Board and the ALJ were in agreement. *N. L. R. B. v. Florida Medical Center, Inc.*, 576 F.2d 666 (5th Cir. 1978). The Board is not bound by credibility determinations made by the ALJ, *N. L. R. B. v. Bogart Sportswear Manufacturing Co.*, 485 F.2d 1203 (5th Cir. 1973), but when the Board makes a contrary credibility choice, the superior advantage of the ALJ in this area should be weighed as a factor in determining whether substantial evidence supports the conclusion of the Board. *Dryden Manufacturing Co. v. N. L. R. B.*, 421 F.2d 267 (5th Cir. 1970).[8]

■ With these principles in mind, we find that, although the question is close, we must overturn the Board's conclusion that Michelle Hill was fired because of anti-union motivation rather than for good cause. It is clear from the record that Hill threatened fellow employees with violence if union cards were not signed. Indeed, she admitted that she shoved one employee into a bathroom stall in an effort to obtain a signature. The employees were frightened and perceived the threats to be serious enough to report to the Company's management. This conduct of Hill was cause for her discharge; the Act does not insulate an employee from discharge for engaging in conduct disruptive of employee relations. *N. L. R. B. v. I. V. Sutphin Co.—Atlanta, Inc.*, 373 F.2d 890 (5th Cir. 1967) (employee discharged after threat of physical violence to fellow employee).

The evidence to sustain a finding of improper motive in the discharge consists of the anti-union speeches made by Stentz, several unpleasant but largely innocuous clashes between Hill and Stentz, the Company's knowledge of Hill's pro-union activities, and testimony that the entire plant joked about tire slashing. Little of this is proximate to the acts for which Hill was discharged. The latter testimony and Hill's explanation that she was only joking were expressly discredited by the ALJ, a factor we must consider. Stentz, before discharging Hill, had forborne one arguable opportunity, the timecard incident. Nor can there be doubt that *serious* tire-slashing threats, combined with a physical assault done in earnest to compel an employee to sign a union card, would furnish ample grounds for discharge. Scant imagination is required to envision what ruling would have followed the finding of such a shoe on the other foot: an assault, say, by a supervisor on Hill arising out of her organizing activities—later sought to be passed off as playful. Here all turns on evaluating the truthfulness of Hill and those she encountered. If she was in earnest, her discharge was proper. If she was not, it may have been wrongful, though such "playfulness" is about on the order of a playful threat to shoot. We can make out little about this from a cold record; the Board can have made no more. Whatever the Board's expertness in the finer points and more esoteric settings of labor situations may be, we are as capable of evaluating the credibility of witnesses' record testimony as it is.

As to such determinations, demeanor, appearance, and manner of testifying tell heavily. The ALJ saw all of these and determined that the threats and the assault were serious and were the motivating cause of Hill's discharge. All the other proximate circumstances, such as the threatened employees' reporting the incidents and Stentz' initial forbearance, bear him out. Despite our deference to the Board, we are unwilling to lay down the rule that one who engages in actions which, if seriously intended, clearly justify discharge need only claim they were playful and, even though

---

8. Chief Judge Brown, writing for the court, addressed this situation in a previous decision:

The preeminence of the Examiner's conclusions regarding testimonial probity does not amount to an inflexible rule that either the Board or a reviewing court must invariably defer to his decision, thereby effectively nullifying either administrative or judicial review. But when the Board second-guesses the Examiner and gives credence to testimony which he has found—either expressly or by implication—to be inherently untrustworthy, the substantiality of that evidence is tenuous at best.

*Ward v. N. L. R. B.*, 462 F.2d 8, 12 (5th Cir. 1972); *see also Universal Camera Corp. v. N. L. R. B.*, 340 U.S. at 496, 71 S.Ct. 456.

the hearing officer finds they were serious, prevail. On balance, we conclude, not without difficulty, that this evidence lacks that substantiality necessary for us to sustain the Board's finding of an improper motive for Hill's discharge. *See N. L. R. B. v. I. V. Sutphin Co.—Atlanta, Inc., supra.*

ENFORCEMENT DENIED.[9]

ALVIN B. RUBIN, Circuit Judge, dissenting.

In this case we review an order of the National Labor Relations Board solely to determine whether it is supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The majority concludes that the Board's decision was not properly supported. My brethren say that the question is close, and I agree, but I am persuaded that the record contains substantial evidence to support the Board's decision.

As the majority notes, it is a familiar principle that, absent a showing of anti-union animus, an employer may discharge an employee "for good cause, or bad cause, or no cause at all." *E. g., Mueller Brass Co. v. NLRB,* 5 Cir. 1977, 544 F.2d 815, 819, *quoting NLRB v. McGahey,* 5 Cir. 1956, 233 F.2d 406, 413. I agree with the majority's finding that Michelle Hill's conduct was a just cause for her discharge. However, even if it is assumed that the threats were real, as the Administrative Law Judge found, I cannot agree with the conclusion that this was the sole reason for her dismissal, or that substantial evidence does not exist to support the Board's finding that there was a causal connection between the anti-union feelings of the supervisors and Hill's discharge. *See NLRB v. Florida Steel Corp.,* 5 Cir. 1978, 586 F.2d 436, 448; *NLRB v. O. A. Fuller Super Markets, Inc.,* 5 Cir. 1967, 374 F.2d 197, 200.

At least one of the supervisors, Stentz, knew that Hill was a union member, and a prime union activist at the plant. Stentz and Hill had previous encounters concerning her union activities. In one instance less than two weeks before she was dismissed, Stentz told Hill not to copy names of employees from record cards. Another time, Hill asked Stentz for financial statements at a meeting attended by outside consultants. Stentz testified that he felt that this incident showed that Hill questioned his honesty or had misjudged him.

The supervisors fired Hill almost immediately after two employees complained that Hill had threatened them. Stentz did not investigate by questioning other witnesses who were present when Hill threatened one of the complaining employees. He did not seek an explanation from Hill about either threat. The supervisor who actually fired Hill did not tell her who her accusers were, or specifically why she was being discharged.

The threats and the dismissal took place at a time when the union was in the midst of an organizing campaign that was hotly opposed by the company. If the atmosphere in the plant had been less tumultuous, it is difficult to believe that the company would have disciplined an employee so summarily or that the discipline would have been so severe. On the basis of this record, the Board's conclusion that the supervisors seized upon a chance to eliminate a prime union activist from the rank and file is sufficiently supported. Therefore, I must respectfully dissent.

---

**9.** We are unpersuaded by the Board's contention that the Company treated differently a separate incident involving a threat made by an employee. On that occasion, following an automobile accident in the Company parking lot, the threatened employee, unlike Hayes and Walker, declined to pursue the matter.